**Brenda FULBRIGHT, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security Administration, Defendant.**

**No. 3:00CV22–H.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 11, 2000.

Jimmy Alan Pettus, Charlotte, NC, for Brenda Fulbright, plaintiff.

Joseph L. Brinkley, U.S. Attorney's Office, Charlotte, NC, for Commissioner of Social Security Administration, defendant.

## MEMORANDUM AND ORDER

HORN, Chief United States Magistrate Judge.

**THIS MATTER** is before the Court on "Plaintiff's Motion for Summary Judgment" and "Plaintiff's Brief Supporting ..." (document # 9), both filed June 5, 2000, and Defendant's "Motion For Summary Judgment" (document # 12) and "Memorandum in Support of the Commissioner's Decision" (document # 13), both filed September 5, 2000. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Social Security disability benefits is supported by substantial evidence. Accordingly, the undersigned will *deny* Plaintiff's Motion for Summary Judgment; *grant* Defendant's Motion for Summary Judgment; and *affirm* the Commissioner's decision.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for Widow's Insurance Benefits (Disability) on October 23, 1996, alleging disability since Decem-

ber 1, 1995 based primarily on "arthritis in spine, legs, and arms; [high blood pressure]; [and] sleep apnea." (Tr. 21–23, 40.) On December 6, 1996 and June 5, 1997 respectively, Plaintiff's claims were denied initially and on reconsideration. (Tr. 24–28, 31–33.)

Plaintiff requested a hearing which was held on January 21, 1998. (Tr. 20, 37–38.) On March 25, 1998, the ALJ issued an opinion denying Plaintiff's claim. (Tr. 7–19.) Plaintiff filed a Request for Review of Hearing Decision on April 27, 1998. (Tr. 6.) After receiving additional evidence, the Appeals Council denied her request for review on November 18, 1999, making the hearing decision the final decision of the Commissioner. (Tr. 3–5.) The Plaintiff filed this action on January 27, 2000, and the parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. *FACTUAL BACKGROUND*

Plaintiff testified that she was born on November 2, 1946; that she was 5'7" tall and weighed 319 pounds and had weighed over 300 pounds since before January, 1996; that she was married to the wage-earner, Gene Fulbright, from April 14, 1974 until Mr. Fulbright's death on January 4, 1989; that she had never remarried; that she lived with her cousin Sandra Williams in Charlotte, North Carolina; that she was a high school graduate and had one year of cosmetology school; that she was not working due to back and leg pain and depression; that she had worked off and on for twenty years as a hairdresser until 1987 and had last done any kind of work in 1990; and that she had already been granted Supplemental Security Income ("SSI") benefits.[1] (Tr. 251–59.)

Regarding her medical and emotional condition, Plaintiff testified that she had pain in her back, legs, and arms which caused her difficulty "getting up or down" or even lying down; that her pain was worse in her left leg and hip; that the pain was "stabbing or wrenching—a burning sensation" which made it difficult to sleep or sit; that three or four days per week her pain prevented her from being able to sit for more than 15 minutes at a time; that pain in her knees made it difficult to sit, stand, or walk; that she could stand for only 20 minutes at a time; that she could only walk 100 feet—"out the door" or "to my car"; that she had fibromyalgia; that she had suffered "passing out spells ... off and on all my life"; that she would experience the onset of "passing out" symptoms every two or three months and would have to lie down for 30 minutes; that she first began to suffer depression in 1990; that she had been diagnosed with post traumatic stress disorder; that she had crying spells three times a week; that she was being treated at the local mental health clinic and was taking medication for her depression which "help[ed] some"; and that her pain and depression caused her to want to be alone. (Tr. 259–74.)

As to daily activities, the Plaintiff testified that she regularly visited with her mother in Spartanburg, South Carolina; that she would stay alone in her bedroom two or three days a week; that she did not go out to shopping malls because seeing "well" people depressed her; that she washed dishes, did her own laundry, and picked up around the house; but that she did not vacuum, sweep, or make her bed. (Tr. 259, 274–77.)

Plaintiff's cousin and housemate, Sandra Williams, testified that Plaintiff had passed out at her home at least once; that Plaintiff did the household chores as mentioned during her testimony plus would help peel potatoes or carrots; that Plaintiff had difficulty standing, bending over, getting up and down; that Plaintiff had crying spells twice a week; that Plaintiff was alone in her bedroom two or three times a week; and that Plaintiff's emotional condition was worsening. (Tr. 278–88.)

---

1. After filing her application in the instant case, Plaintiff filed an application for SSI benefits on July 29, 1997, and was found to be disabled as of that date. (Tr. 256.)

The record also contains a number of representations by Plaintiff as contained in her various applications in support of her claim. On a Disability Report dated October 23, 1996, Plaintiff stated that her disabling condition was "arthritis in spine, legs, and arms; [high blood pressure]; [and] sleep apnea"; that pain in her leg and lower spine prevented her from working; that she suffered kidney stones, high blood pressure, and depression; that her doctor had not told her to cut back or limit her activities in any way; that she lived in her cousin's house, where she straightened up the house, grocery shopped, and took turns cleaning up; that she did ceramics and other crafts—"anything with [her] fingers"; that she visited her aunt's house next door every day; that she drove; that she was 5′8″ tall and weighed 310 pounds; and that her previous job in hairdressing required frequent walking, standing, bending, and reaching. (Tr. 40–47.)

On a Reconsideration Disability Report dated March 20, 1997, Plaintiff stated that her condition was unchanged; that no doctor had placed restrictions on her activities; that she could not "do anything" due to stress; that she suffered mental illness; that her illness did not effect her ability to care for herself; and that her daily activities were unchanged. (Tr. 48–50.)

An October 23, 1996 Report of Contact, taken by telephone, records that Plaintiff "doesn't know if she [has depression] or not"; that Plaintiff enjoyed crafts and ceramics; that Plaintiff ate out once a week; and took care of her own personal business affairs. (Tr. 58.)

An October 29, 1996 Report of Contact, taken by telephone, records that Plaintiff had pain in her legs and back, high blood pressure, sleep apnea, kidney stones; that Plaintiff weighed between 280 and 312 pounds; and that Plaintiff owned a car and drove. (Tr. 59–61.)

On a second Reconsideration Disability Report dated August 18, 1997, Plaintiff stated that her "depression is sometime [sic] real bad, diarrhea and hemorrhoids again having trouble with keeping blood sugar, alway [sic] weak"; that "I've even had trouble with these reports—concentration, anxiety, and nervousness"; that no doctor had placed restrictions on her activities; that she had a bad fall in 1994 and "several after that"; that her medication caused her difficulty in understanding "book work" and to become disoriented, sleepy, and irritable. (Tr. 51–57.)

On a September 5, 1997 Claimant's Statement When Request For Hearing is Filed, Plaintiff stated that her condition and daily activities were unchanged since the date of her previous statement. (Tr. 62–63.)

On November 6, 1996, Dr. Earl J. Epps, Jr., performing a consultative examination for North Carolina Disability Determination Services, noted that Plaintiff complained primarily of arthritis in her spine, arm, and legs, hypertension, and possible sleep apnea; that Plaintiff stated that her knee pain began when she was a teenager; that Plaintiff's medical records did not clearly state when she was diagnosed with arthritis; that Plaintiff was morbidly obese—5′7″ and 320 pounds; that she had been on high blood pressure medication for 18 years; that Plaintiff had no difficulty in getting on or off the examination table or in dressing/undressing herself; that Plaintiff had normal range of motion in her shoulders, arms, hands, hips, ankles, and feet; and concluded that Plaintiff suffered from major joint pain, hypertension, possible sleep apnea secondary to morbid obesity, and a recent diagnosis of depression. (Tr. 210–15.)

On November 11, 1996, Walter B. McNulty, Ph.D., performing a psychological consultative examination for North Carolina Disability Determination Services, noted that Plaintiff complained of depression; that Plaintiff drove alone to the interview site; that Plaintiff was tense and anxious; that Plaintiff reported symptoms of depressed mood, crying, weight gain, blackouts, "night terrors," and vomiting; that Plaintiff stated she was supervising the remodeling of a house she owned

and spent most of her day talking with contractors; that Plaintiff stated that she cooked, shopped, and took care of her personal grooming; that Plaintiff's depression and personality disorder had a mild to moderate impact on her psychosocial functioning; that Plaintiff could work if given simple instructions and could perform simple repetitive tasks; but that Plaintiff's motivation to work was "questionable." (Tr. 216–19.)

On December 4, 1996, Dr. Brett A. Fox completed a Psychiatric Review Technique, concluding that Plaintiff suffered from an affective disorder (depression) and personality disorder resulting in slight restrictions on her activities of daily living, moderate difficulty in maintaining social functioning, often suffering deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, but no episodes of deterioration in work or work-like settings. (Tr. 78–86.)

On December 4, 1996, Dr. Fox also completed a Mental Residual Functional Capacity Assessment, noting that Plaintiff suffered only moderate limitations to her mental faculties, that Plaintiff had previously been diagnosed with depression, and that Plaintiff could perform simple routine, repetitive jobs but her ability to relate to co-workers and supervisors was moderately impaired. (Tr. 66–69.)

On December 4, 1996, Dr. Bruce B. Blackmon, completed a Residual Physical Functional Capacity Assessment noting that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that she could sit, stand, and/or walk 6 hours in an 8 hour workday, and that her ability to push and/or pull was unlimited. Dr. Blackmon noted no other limitations on Plaintiff, either exertional or nonexertional. (Tr. 70–77.)

On May 27, 1997, Dr. Robert W. Willett, completed a Residual Physical Functional Capacity Assessment noting that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that she could sit, stand, and/or walk 6 hours in an 8 hour workday, and that her ability to push

and/or pull was unlimited. Dr. Willett noted no other limitations on Plaintiff, either exertional or nonexertional. (Tr. 87–84.)

On May 27, 1997, an evaluator (with an illegible signature) for the North Carolina Disability Determination Services completed a Mental Residual Functional Capacity Assessment, noting that Plaintiff suffered, at most, only moderate limitations to her mental faculties. (Tr. 95–98.)

On May 29, 1997, the same reviewer also completed a Psychiatric Review Technique, concluding that Plaintiff suffered from an affective disorder (depression) and personality disorder resulting in moderate restrictions on her activities of daily living, slight difficulty in maintaining social functioning, often suffering deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, but finding no evidence of episodes of deterioration in work or work-like settings. (Tr. 99–107.)

The medical records submitted to the ALJ (at or after the hearing) established that Plaintiff was admitted to the Trident Regional Medical Center ("Trident"), Charleston, South Carolina, from February 1 to February 5, 1988. The Trident chart reflects that Plaintiff was diagnosed with a mass in her abdomen; underwent an exploratory laparotomy, followed by an oophorectomy and appendectomy; and was discharged with a post-operative diagnosis of endometriosis, chronic hypertension, and obesity. (Tr. 108–17.)

Plaintiff, complaining of hemorrhoids, was re-admitted to Trident from September 30 to October 2, 1988; underwent a hemorrhoidectomy; and was discharged to follow up with Dr. Jon R. Jacobs. (Tr. 118–125.)

On December 6, 1989, Plaintiff, complaining of high blood pressure, diarrhea, headaches, and weight gain, saw Dr. Kim Meadows, Care Plus Medical Center, P.A. ("Care Plus"), Summerville, South Carolina, who noted that Plaintiff had a childhood history of seizures but no recent sei-

zures; that Plaintiff was 5'9" tall and weighed 331 pounds; that Plaintiff would begin new blood pressure medication; that Plaintiff's diarrhea and other gastric problems would resolve with over-the-counter medications; and that the exam, including an echocardiogram, revealed no significant findings. (Tr. 126–30, 154.)

On December 21, 1989, Plaintiff saw Dr. Meadows who noted that Plaintiff had no new complaints; that Plaintiff's blood pressure was poorly controlled and medication would be increased; that the change in blood pressure medication had resulted in fewer side effects; and that Plaintiff was to follow up in six weeks. (Tr. 131.)

On February 9, 1990, Plaintiff, complaining of diarrhea, saw Dr. Meadows who noted that Plaintiff was a "very pleasant overweight female, alert and oriented, feeling well"; that a gastroenterologist had diagnosed irritable bowel syndrome; that Plaintiff probably suffered reflux which was now well controlled; and that Plaintiff was to return in six months. (Tr. 132.)

On May 11, 1990, Plaintiff, complaining of difficulty urinating and bloody stools, saw Dr. Meadows who diagnosed hemorrhagic cystitis; prescribed Septra; noted that Plaintiff's blood pressure was under control; and instructed Plaintiff to return in four to six months. (Tr. 133–42.)

On June 8, 1990, Plaintiff, complaining of difficulty urinating, saw Dr. Meadows who diagnosed a urinary tract infection; discontinued Septra; and prescribed Ceftin. (Tr. 143–45.)

On June 10, 1990, Plaintiff returned to Dr. Meadows who noted that Plaintiff's condition was resolving then, and all symptoms of urinary tract infection were gone on her June 25, 1990 follow up appointment. (Tr. 146–47.)

At some point during the summer of 1990, Plaintiff saw Patrick O'Neil, Ph.D., and Jane M. Kudlas, M.S., at the M.U.S.C. Medical Center, Charleston, South Carolina. Dr. O'Neil and Ms. Kudlas' "Psychological Report" notes that Plaintiff desired to lose 100 pounds; that Plaintiff appeared to be motivated and intelligent;

that Plaintiff suffered dysthymia (depression) and post traumatic stress disorder due to being sexually assaulted as a child; that Plaintiff "may be very successful in losing weight" through group therapy, but "her behavioral mannerisms may alienate her" from other group members; and that Plaintiff was referred to the Crime Victim's Research and Treatment Center ("Crime Victims Center"). (Tr. 227–28.) Plaintiff later told Ms. Kudlas that she had not contacted the Crime Victims Center. (Tr. 229.) The record reflects that Plaintiff lost 38 pounds during the first 2½ months of her participation in the 5 month group therapy program but then dropped out. (Tr. 230.)

On August 29, 1990, Plaintiff, complaining of bladder pain, saw Dr. Meadows who diagnosed urinary tract infection and prescribed Septra. (Tr. 148.)

On September 22, 1990, Plaintiff, complaining of bladder pain, saw Dr. Meadows who noted that Plaintiff was scheduled for out patient surgery on October 1, 1990. (Tr. 148.)

Due to the recurrent urinary tract infections and a urethral stricture, on October 1, 1990, Plaintiff underwent outpatient cystoscopy and urethral dilation, performed by Dr. W.C. Carter, Ill at Roper Hospital, Charleston, South Carolina. (Tr. 156–68.)

On October 6, 1990, Plaintiff saw Dr. Meadows who continued the Plaintiff on her medications. (Tr. 149.)

On November 27, 1990, Plaintiff had an MRI at Charleston Magnetic Imaging which revealed degenerative disc disease in multiple discs with a small central herniation at L4–5. (Tr. 169.)

On December 31, 1990, Plaintiff, complaining of a cough and congestion, saw Dr. Meadows who diagnosed an upper respiratory infection and prescribed Keflin. (Tr. 149.)

On May 16, 1991, Plaintiff saw Dr. Meadows who noted that Plaintiff was traveling to Idaho for five weeks; that Plaintiff wanted a prescription in case she

got a bladder infection; and that Plaintiff was "doing well." (Tr. 150.)

On September 21, 1991, Plaintiff, complaining of abdominal pain and bloody stools, was admitted at Trident and treated by Dr. Michael S. Sabback who noted that Plaintiff denied headaches, dizziness, chest pain, or shortness of breath; that Plaintiff was admitted for intravenous hydration and stool studies; and that Plaintiff was discharged on September 22, 1991. (Tr. 170–71.) Dr. Sabback's clinic notes reflect that Plaintiff underwent a colonoscopy and barium enema which were normal; that Plaintiff's colitis had resolved; and that Plaintiff was released on October 29, 1991 to return as needed. (Tr. 172.)

On September 30, 1991, Plaintiff, complaining of pain in her sinuses, ears, and chest, saw Dr. Meadows who diagnosed sinusitis, and prescribed Keflin. (Tr. 151.)

On November 27, 1991, Plaintiff, complaining of dizzy spells the previous week, saw Dr. Meadows who continued Plaintiff's medication. (Tr. 151.)

Plaintiff next saw Dr. Meadows on March 16, 1993 complaining of stress. Dr. Meadows noted that Plaintiffs weight was 295 pounds and continued Plaintiff's medications. (Tr. 151.)

On February 8, 1994, Plaintiff, complaining of a cough and runny nose, saw Dr. Meadows who diagnosed sinusitis and prescribed an antibiotic. (Tr. 152.)

On February 6, 1995, Plaintiff saw Dr. Meadows who noted that Plaintiff's blood pressure was controlled; that she had "good heart sounds"; and that Plaintiff weighed 305½ pounds. (Tr. 153–55.)

On February 7, 1996, Plaintiff, complaining of pain in her left wrist and hand, saw Dr. W.C. Lovett at Family Medicine Faculty Group, Spartanburg, South Carolina, who noted that Plaintiff reported a fall a year and one-half earlier which hurt her left knee; ordered further evaluation for possible osteoarthritis; prescribed painkillers and heat; and recommended Plaintiff begin vocational rehabilitation. (Tr. 174.)

On February 12, 1996, Plaintiff saw Dr. Lovett who noted that Plaintiff reported no recent problems but recounted a history of passing out; that x-rays and blood work conducted after the first exam were negative; and that Plaintiff's blood sugar needed to be checked. (Tr. 174, 179–83.)

On March 4, 1996, Plaintiff, reporting that her leg pain was improved but her arm still hurt, saw Dr. Lovett who noted that an EEG was normal; that Plaintiff's blood pressure was in "normal range"; and that Plaintiff's throat was slightly red. (Tr. 175.)

On March 5, 1996, Plaintiff, complaining of blood in her urine, saw Dr. Lovett who diagnosed hemorrhagic cystitis; prescribed painkillers and antibiotics; and noted that Plaintiff was in vocational rehabilitation. (Tr. 175.)

On March 15, 1996, Plaintiff saw Dr. Lovett for a blood pressure check and Dr. Lovett noted that Plaintiff's blood pressure was controlled by medication. (Tr. 176.)

Reports dated March 19, 1996, and May 3, 1996, from the South Carolina Vocational Rehabilitation Department reflect that Plaintiff entered Vocational Rehabilitation on April 29, 1996; that Plaintiff stated she could not tolerate the stress of full-time employment; that Plaintiff was referred to pain management and work adjustment training; and that Plaintiff was discharged with a "guarded prognosis" on May 3, 1996. (Tr. 231–32.)

On March 20, 1996, Plaintiff, complaining of pain, saw Dr. Lovett who diagnosed tennis elbow and noted that Plaintiff's blood pressure was controlled. (Tr. 177.)

On May 2, 1996, Dr. Lovett again checked Plaintiff's blood pressure which was controlled. (Tr. 177.)

On May 15, 1996, Plaintiff saw Dr. Josette R. Johnson, at the Piedmont Arthritis Clinic, Greenville, South Carolina, who noted that Plaintiff complained of joint pain which had worsened in December 1995; that Plaintiff was 5'8" and weighed 322 pounds; that Plaintiff had degenera-

tive arthritis and possibly a "disc problem" in her lower back; that x-rays and lab tests were normal; and that Plaintiff's weight had "not helped with her discomfort." (Tr. 184–88, 190–94.)

On May 24, 1996, Plaintiff, complaining of pain and swelling in her knees and ankles, saw Dr. Johnson who noted that a physical exam showed that Plaintiff's knees were "ok" and that Plaintiff had edema (swelling) in her lower legs. (Tr. 189.)

On June 12, 1996, Plaintiff, complaining of arthritis and reflux, saw Dr. Lovett who prescribed Bumex for esophageal reflux and continued Plaintiff's other medications. (Tr. 178.)

On September 19, 1996, Plaintiff, complaining of a rash on her arms, torso, and legs, went to the Emergency Department at Carolinas Medical Center ("CMC"), Charlotte, North Carolina, and the chart reflects that Plaintiff did not have a private care physician; that an exam revealed a rash which was resolving; and that Plaintiff was discharged with instructions to avoid chocolate and caffeine and follow up in the CMC Medical Clinic. (Tr. 195–99.)

On September 23, 1996, Plaintiff was seen for follow up in the CMC Medical Clinic by Dr. Mary Ann Smalls who noted that Plaintiff complained of difficulty sleeping and joint pain, but a physical exam was negative for arthritis. (Tr. 233.)

On September 25, 1996, Plaintiff was seen in the CMC Outpatient Department and the sketchy note reflects that the exam was unremarkable. (Tr. 200.)

On October 9, 1996, Plaintiff, complaining of a cough, runny nose, fever, and chills, saw Dr. Smalls who diagnosed bronchitis; prescribed antibiotics; noted high blood pressure; and directed Plaintiff to follow up with a blood pressure check. (Tr. 201.)

On October 21, 1996, Plaintiff, complaining of arthritic pain, depressed mood, and crying spells, was seen in the CMC Medical Clinic and the chart reflects that Plain-

tiff stated Tylenol provided "mild relief" for the pain; that Plaintiff suffered depression and "social issues," sleep apnea, and high blood pressure; that Plaintiff would follow up for blood pressure checks; and that Plaintiff began taking Zoloft for depression and go to the CMC Mental Health Clinic. (Tr. 202–03.)

On November 4, 1996, Plaintiff went to the CMC Medical Clinic for a blood pressure check, which was high; her blood pressure medication was increased; and she was directed to follow up again in two weeks. (Tr. 204.)

On December 9, 1996, Plaintiff, complaining of leg pain, saw Dr. Smalls who noted that Plaintiff had been in South Carolina for three weeks and had not set up a Mental Health appointment yet; that Plaintiff was given a Mental Health appointment; and that Plaintiff's problems stemmed from depression and obesity. (Tr. 234.)

On December 31, 1996, Plaintiff was seen by Francis M. Mondimore, M.D., at the CMC Mental Health Clinic who noted that Plaintiff stated "I am depressed because of all my physical problems"; determined that Plaintiff was oriented and alert with logical and normal thoughts, good judgment, and average cognition; diagnosed dysthymia (depression); and prescribed Wellbutrin and Zoloft. (Tr. 221.)

On March 11, 1997, Plaintiff, complaining of depression, anxiety, and overeating, returned to the CMC Mental Health Clinic and saw Robert Bright, M.D., who ruled out an eating disorder and discontinued Zoloft and prescribed Prozac. (Tr. 222.)

On March 13, 1997, Plaintiff, complaining of headaches and depression, saw Dr. Smalls who noted that Plaintiff's blood pressure was high; that Plaintiff was depressed and was being seen in the CMC Mental Health Clinic; that Plaintiff's headache was "most likely" caused by tension, but that Plaintiff would see an opthamologist to rule out a vision problem; and that Plaintiff was referred for a mammogram

and for an orthopedic consultation. (Tr. 205.)

On March 19, 1997, Plaintiff was seen in the CMC Outpatient Department for a routine breast exam and pap smear, which were normal. (Tr. 206, 209.)

On March 23, 1997, Plaintiff saw Mr. Larry Yarbrough, M.A., at the CMC Mental Health Clinic who noted that Plaintiff suffered depression and anxiety secondary to her physical problems; that Plaintiff did not have a panic disorder; and that Plaintiff was to attend counseling for six months. (TR. 223.)

On March 27, 1997, Plaintiff had a blood pressure check at the CMC Medical Clinic and was continued on her medications. (Tr. 207.)

On April 9, 1997, Plaintiff met with a dietician at the CMC Medical Clinic who recommended a low fat, low calorie, low sodium diet and exercise. Plaintiff stated that her leg problems prevented her from exercising. (Tr. 208.)

On April 28, 1997, Plaintiff had her blood pressure checked at the CMC Medical Clinic and was continued on the same medications. (Tr. 235.)

On May 6, 1997, Plaintiff, complaining of left foot pain, saw Dr. Robin Hakanson at the CMC Medical Clinic who recommended foot stretching and referred her to Metrolina Prosthetic Orthotic Center for a shoe orthosis.

On May 12, 1997, Plaintiff was seen at the CMC Medical Clinic and the chart reflects that Plaintiff complained of depression and chronic pain; that Plaintiff's blood pressure was controlled; and that Plaintiff was told that her symptoms were related to her depression. (Tr. 237.)

On August 4, 1997, Plaintiff was seen at Myers Park Internal Medicine Clinic and the chart reflects that Plaintiff complained of headaches, black outs, and diarrhea; that Plaintiff was given Trazadone for her pain; and that her blood pressure medication was increased. (Tr. 238.)

On September 29, 1997, Plaintiff was seen at the CMC Medical Clinic and the chart reflects that Plaintiff had multiple complaints of pain, depression, diarrhea, insomnia, and excessive snoring; that Plaintiff was referred for a sleep study; and that Plaintiff's diarrhea was caused by irritable bowel syndrome. (Tr. 239.)

On October 13, 1997, Plaintiff was seen at Myers Park Internal Medicine Clinic and the chart reflects that Plaintiff had no new complaints but was "convinced she has chronic fatigue syndrome and immune deficiency syndrome"; that Plaintiff recounted a history of "chronic black out spells since childhood" despite the fact that prior "EEG's were all negative"; and that Plaintiff's blood pressure medication was changed. (Tr. 240.)

On October 28, 1997, Plaintiff was seen at Family Medical Faculty Group, Spartanburg, South Carolina, by Dr. Otis Baughman who noted that Plaintiff's blood pressure was controlled; that Plaintiff complained of chronic pain "everywhere"; and that in addition to depression and hypertension, Plaintiff suffered either a sleep disorder or fibromyalgia. (Tr. 244.)

On November 11, 1997, Plaintiff saw Dr. Baughman who noted that Plaintiff had no new complaints and was attending a fibromyalgia/chronic fatigue support group. (Tr. 245.)

On November 17, 1997, Plaintiff, complaining of chronic low back pain, was seen at the CMC Medical Clinic and the chart reflects that Plaintiff stated she "has fibromylagia and c[hronic] f[atigue] s[yndrome]"; that Plaintiff moved from chair to examining table with ease; and that Plaintiff was told to continue with Mental Health and referred to a rheumatologist. (Tr. 241.)

On December 16, 1997, Plaintiff saw Dr. Baughman who noted that Plaintiff still had insomnia and chronic pain and that Plaintiff's options were to treat the pain or see a neurosurgeon for her back. (Tr. 246.)

On December 18, 1997, Plaintiff, complaining of chronic lower back pain, saw a rheumatologist at Myers Park Internal Medicine Clinic and the chart reflects that

Plaintiff weighed 327 pounds; that Plaintiff had normal strength in all joints and muscles with no swelling in the joints; that Plaintiff was given a muscle relaxant and continued on "conservative treatment," including a recommendation for physical therapy. (Tr. 243.)

On December 19, 1997, Plaintiff was seen again at the Myers Park Internal Medicine Clinic and the chart reflects that Plaintiff's blood pressure was better; that Plaintiff was attending counseling twice a month; that Plaintiff "is stable" and "emotionally improved"; that Plaintiff's fibromyalgia was being treated conservatively; and that Plaintiff would follow up in two to three months. (Tr. 242.)

The ALJ considered all of the above recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. (Tr. 17–19.) It is from this determination that Plaintiff appeals.

### III. *STANDARD OF REVIEW*

■ The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, *Richardson v. Perales,* 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); and (2) whether the Commissioner applied the correct legal standards. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990); *see also Hunter v. Sullivan,* 993 F.2d 31, 34 (4th Cir.1992) *(per curiam ).* The district court does not review a final decision of the Commissioner *de novo.* *Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir.1986); *King v. Califano,* 599 F.2d 597, 599 (4th Cir.1979); *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C.

§ 405(g). In *Smith v. Heckler,* 782 F.2d 1176, 1179 (4th Cir.1986), *quoting Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Fourth Circuit defined "substantial evidence" thus:

Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*See also Seacrist v. Weinberger,* 538 F.2d 1054, 1056–57 (4th Cir.1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

■ The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. *Hays v. Sullivan,* 907 F.2d at 1456 (4th Cir.1990); *see also Smith v. Schweiker,* 795 F.2d at 345; *and Blalock v. Richardson,* 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome-so long as there is "substantial evidence" in the record to support the final decision below. *Lester v. Schweiker,* 683 F.2d 838, 841 (4th Cir.1982).

### IV. *DISCUSSION OF CLAIM*

A claimant between the ages of 50 and 60 seeking Widow's Insurance Benefits based on disability must show that the "disability started not later than 7 years after the insured died." 20 C.F.R. § 404.335(c). Plaintiff's husband, Gene Fulbright, died on January 4, 1989. (Tr. 21.) The question before the ALJ was therefore whether the Plaintiff became "disabled" as that term of art is defined for Social Security purposes [2] before Janu-

---

**2.** Under the Social Security Act, 42 U.S.C. § 301, *et seq.,* the term "disability" is defined as an:

inability to engage in any substantial gainful activity by reason of any medically de-

terminable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

ary 31, 1996. It is not enough for a claimant to show that she suffered from severe medical conditions or impairments which later became disabling; rather, the subject medical conditions must have become disabling prior to the date last insured. *Harrah v. Richardson,* 446 F.2d 1, 2 (4th Cir.1971) (no "manifest error in the record of the prior administrative proceedings" where plaintiff's conditions did not become disabling until after the expiration of his insured status).

The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 1, 1995; that the Plaintiff is the widow of a wage earner who died fully insured on January 4, 1989, and has not remarried; that she suffered from hypertension, degenerative disc disease and a herniated nucleus pulposus of the lumbar spine, osteoarthritis of the knees, depression, and obesity, which were severe impairments within the meaning of the Regulations; but that Plaintiff's combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that she was unable, due to these problems, to perform her past relevant work as a hairdresser; and that she was able to perform the exertional requirements of unskilled "light"[3] work with a sit/stand option and both the exertional and nonexertional requirements of unskilled "sedentary"[4] work. (Tr. 17–19.)

Applying the Medical–Vocational Guidelines, 20 C.F.R. 404, Subpart P, Reg. No. 4. ("the Guidelines"), the ALJ found that because Plaintiff was a "younger individual" with a high school education, unskilled work experience, but retaining the residual functional capacity to perform sedentary work up and until January 31, 1996, Plaintiff was not "disabled" under the Act. (Tr. 16, *citing* Rule 201.00(h) of Subpart P, Reg. No. 4, App. 2, Tables No. 1 and 2.)

The Plaintiff first contends that she was "disabled" within the meaning of the Act because of her obesity and correctly points out that under former Section 9.09 of 20 C.F.R. § 404, Subpart P, app.1 (1999), a Plaintiff with her height and weight would meet the criteria for the disabling impairment of obesity.[5] However, Listing 9.09 was deleted from the Listing of Impairments effective October 25, 1999. *See Revised Medical Criteria for Determination of Disability, Endocrine System and Related Criteria,* 65 Fed.Reg. 46, 122 (1999). New language relating to obesity was inserted in listing sections 1.00(F) (musculoskeletal system), 3.00(I) (respiratory system), and 4.00(F) (cardiovascular system) which provides that obesity must be evaluated for its effects on the claimant.

months .... *Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir.1995).

**3.** "Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing tip to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as

loss of fine dexterity or inability to sit for long periods of time.

**4.** "Sedentary" work is defined in 20 C.F.R. § 404.1567(a) as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and the other sedentary criteria are met.

**5.** The record establishes that during the relevant time the Plaintiff was at most 5'9" tall and weighed no less than 300 pounds.

This removal of former Listing 9.09 and subsequent revision to the other listing sections is the law in effect for this case. *See Landgraf v. USI Film Products*, 511 U.S. 244, 273–77, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (reaffirming general principle that a court is to apply the law in effect at the time of its decision); *and* SSR 00–3p "Titles II and SVI: Evaluation of Obesity," 65 Fed.Reg. 31, 039 (2000) ("The final rules deleting listing 9.09 apply to claims that were filed before October 25, 1999, and that were awaiting an initial determination or that were pending appeal at any level of the administrative review process or that had been appealed to court."). Therefore, the ALJ did not err in failing to find the Plaintiff's height and weight alone as a basis for disability.

The Plaintiff also contests the ALJ's determination of her residual functional capacity. *See* "Plaintiff's Motion for Summary Judgment" and "Plaintiff's Brief Supporting . . ." (document # 9).

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations also indicate that:

> A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work.

*Id.*

■ The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff was limited in lifting, sitting, standing, walking, carrying, pushing, pulling or other physical functions. Agency evaluators concluded that she could lift 50 pounds occasionally and 25 pounds frequently—requirements for "medium" work; that her strength, grip and dexterity were normal; that she could sit, stand, and/or walk 6 hours in an 8 hour workday, and that her ability to push and/or pull was unlimited. (Tr. 70–77, 87–84.) However, the ALJ found that Plaintiff was restricted in these activities to a degree commensurate with the performance of either "light" work or "sedentary" work as defined in the Regulations. Specifically, the ALJ determined that Plaintiff could lift up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. He imposed only the further restrictions on Plaintiff's residual functional capacity that he found to be supported by the medical records and Plaintiff's credible testimony—limiting light jobs to those that provided a sit/stand option. (Tr. 17–19.)

No treating physician has ever opined that Plaintiff's impairments or combination thereof were conditions so severe that they disabled her from work, or even that they significantly limited her activities. (Tr. 40, 48, 51, 62.) Indeed, the Plaintiff admits that she *quit* her last regular job—as a hair dresser. (Tr. 251–59.) On this point, *see, e.g., Cauthen v. Finch*, 426 F.2d 891, 892 (4th Cir.1970) (plaintiff's voluntary cessation of employment constituted substantial evidence of no disability).

Rather than proving the existence of a disability, the record clearly supports the ALJ's essential conclusion: that Plaintiff suffered from—but was not disabled by—hypertension, degenerative disc disease and a herniated nucleus pulposus of the lumbar spine, osteoarthritis of the knees, depression, and obesity. This conclusion is bolstered by the fact that Plaintiff claimed her health problems prevented her from engaging in daily activities or working, but then failed to seek medical treatment *and* failed to follow her doctors' recommendations when she did seek treatment—for example, dropping out of weight loss group therapy and failing to follow

through on Dr. Smalls' recommendation to see a counselor. (Tr. 205, 230.) The Plaintiff also went significant periods of time without seeking *any* medical attention—February 27, 1991 to March 16, 1993—and saw a doctor only once (February 6, 1995) between February 8, 1994 and February 7, 1996. (Tr. 151, 152–55, 174.)

On November 6, 1996, Dr. Earl J. Epps, Jr. noted that Plaintiff had no difficulty in getting on or off the examination table or in dressing/undressing herself and that Plaintiff had normal range of motion in her shoulders, arms, hands, hips, ankles, and feet. (Tr. 210–15.) Dr. Walter B. McNulty noted on November 11, 1996 that Plaintiff drove alone to the interview site; that Plaintiff stated she was supervising the remodeling of a house she owned and spent most of her day talking with contractors; that Plaintiff stated that she cooked, shopped, and took care of her personal grooming; and that Plaintiff could work if given simple instructions and could perform simple repetitive tasks; and that Plaintiff's motivation to work was "questionable." (Tr. 216–19.)

The record also establishes that Plaintiff's mental health and other medical treatments were effective when she complied with them; that Plaintiff engaged in significant daily life activities, such as visiting her mother and her aunt, supervising renovations of a house, shopping, cleaning the house, and eating at restaurants; and that Plaintiff was able to perform basic cognitive and physical tasks. *See, e.g., Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir.1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), *citing Purdham v. Celebrezze,* 349 F.2d 828, 830 (4th Cir. 1965); *and Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir.1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel).

■ In addition to the ALJ's treatment of the medical records, he properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain, and the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was *not* fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." *Craig v. Chater,* 76 F.3d 585, 594 (4th Cir.1996), *citing* 20 C.F.R. § 416.929(b); § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must then evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595, *citing* 20 C.F.R. § 416.929(c)(1) *and* § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

*Id.* (citations omitted).

The record contains evidence of Plaintiff's hypertension, degenerative disc disease and a herniated nucleus pulposus of the lumbar spine, osteoarthritis of the knees, depression, and obesity—conditions which *could* reasonably be expected to produce some of the pain claimed by Plaintiff—and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in *Craig.* However, the ALJ evaluated the "intensity and per-

sistence of [her] pain, and the extent to which it affects [her] ability to work," and essentially found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." *Mickles,* 29 F.3d at 921, *citing Hunter v. Sullivan,* 993 F.2d 31 (4th Cir.1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen supported ALJ's inference that claimant's pain was not as severe as he asserted). As noted above, the record before the ALJ contained substantial evidence to support a finding of inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on with moderate daily activities. Specifically, Plaintiff owned and drove a car, supervised contractors remodeling a house, visited her mother and her aunt, traveled to Idaho, went shopping, and went to restaurants. Plaintiff's cousin and housemate, Sandra Williams, testified that Plaintiff helped her cook meals, wash dishes, do laundry, and pick up the house. (Tr. 278–88.)

Although the medical records in this case establish that Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." *Seacrist v. Weinberger,* 538 F.2d 1054, 1056–57 (4th Cir.1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working by her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." *Mickles v. Shalala,* 29 F.3d 918, 923 (4th Cir.1994), *citing Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the credibility of Plaintiff's subjective complaints of pain; her activities of daily life; and her residual functional capacity.

## V. *ORDER*

NOW, THEREFORE, IT IS ORDERED:

1. "Plaintiff's Motion For Summary Judgment" (document # 9) is **DENIED;** Defendant's "Motion for Summary Judgment" (document # 12) is **GRANTED;** and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.