**Gwendolyn PORTLOCK, Plaintiff,**

v.

**Kenneth S. APFEL, Defendant.**

**No. Civ.A. 99–931–RRM.**

United States District Court, D. Delaware.

July 3, 2001.

Bayard Snyder, Wilmington, DE, Meyer Silver, Silver & Silver, Ardmore, PA, for plaintiff.

James A. Winn, Regional Chief Counsel, Margaret Maguire, Deputy Chief Counsel, Social Security Administration, Philadelphia, PA, Carl Schnee, United States Attorney, Ellen W. Slights, Assistant United States Attorney, Wilmington, DE, for defendant.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a social security case. Plaintiff Gwendolyn Portlock is a resident of Delaware. Defendant Kenneth S. Apfel is the Commissioner of Social Security. On December 29, 1999, Portlock filed a complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's decision to deny her claim for disability insurance benefits and supplemental security income. On March 14, 2000, the Commissioner answered the complaint, asserting that Portlock is not entitled to disability insurance benefits or supplemental security income because the Administrative Law Judge's decision was supported by substantial evidence.

On May 31, 2000, Portlock moved for summary judgment. In response, the Commissioner moved for cross-summary judgment on August 18, 2000. On August, 28, 2000, Portlock filed a brief in reply to the Commissioner's motion. This is the court's decision on the motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Application for Disability Insurance Benefits and Supplemental Security Income

On September 19, 1995, Portlock filed an application for disability insurance benefits and supplemental security income. In the application, Portlock asserted that she became disabled on March 1, 1995 because of depression, anxiety, patellar bursitis, obesity, hypertension and asthma. On February 1, 1996, Larry Massanari, the Regional Commissioner for the Social Security Administration, denied Portlock's claim stating that her condition was not sufficiently severe to keep her from working. On February 26, 1996, Portlock submitted a Request for Reconsideration. Massanari denied Portlock's Request for Reconsideration on an unspecified date. On June 27, 1996, Portlock requested a hearing before an Administrative Law Judge.

### B. Administrative Hearing

On April 20, 1998, Administrative Law Judge William J. Reddy conducted a hearing to determine whether Portlock qualified for a period of disability or disability insurance benefits under §§ 216(i) and 223 of the Social Security Act, or for supplemental security income under §§ 1602 and 1614(a)(3)(A) of the Act. Judge Reddy considered the testimony of Portlock and William T. Slaven, III, a Vocational Expert, and reviewed medical documents related to Portlock's medical history. In a comprehensive opinion on June 18, 1998, Judge Reddy concluded that Portlock was not entitled to disability insurance benefits or supplemental security income. On November 9, 1999, the appeals council denied Portlock's request for review of the Judge Reddy's decision. As a result, Portlock filed her complaint in this court.

### C. Portlock's Medical History

The following facts are taken from this court's independent review of the transcripts of the administrative hearings and the supporting documents that are contained in the record.

#### 1. Portlock's Documented Medical History By Care Providers Other Than Her Treating Physicians

At the time of the hearing, Portlock was a 35 year-old female. She alleges that she is disabled because of depression, anxiety, patellar bursitis, obesity, hypertension and asthma. Portlock has a high school education and has finished two and one half years of college. She previously worked as a food service worker, psychiatric at-

tendant, child care worker and nursing assistant.

The Medical Center of Delaware treated Portlock from July 1995 to August 1995. On July 14, 1995, Portlock made her initial visit to the Medical Center, at which time she weighed 314 pounds and her blood pressure was 162/110. On July 28, 1995, a progress report indicates that Portlock weighed 310.5 pounds and that her blood pressure was 132/88. The report further indicates that Portlock had full passive and active range of motion in her knees with some discomfort. Furthermore, a x-ray demonstrated "no bony abnormalities," fracture or dislocation of her right knee. In regard to her mental condition, the report indicated that Portlock's fiancé had recently died from AIDS and, as a result, she was "anxious" for the results of her AIDS test. On August 11, 1995, Portlock weighed 310 pounds and her blood pressure was 142/100. Moreover, Portlock's bursitis had improved and a medication combination had "work[ed] well" on her depression and anxiety.

Psychologist Elizabeth Bolton treated Portlock from October 2, 1995 to February 2, 1996. In that time, Bolton completed seven Mental Health Service Tickets including a psychiatric evaluation completed on November 3, 1995. Bolton concluded that Portlock suffered from major depression. Nevertheless, Bolton opined that Portlock fell in the range of 65–70 on the Global Assessment of Functioning Scale, which assesses mental health. Portlock's score indicated that she was functioning "pretty well," while suffering from mild symptoms. In January 1996, on the last Mental Health Service Ticket, Bolton reported that Portlock's mood was improved and that her affect was bright.

John F. Decarli, D.O., examined Portlock's physical condition on November 21, 1995 for the Delaware Disability Determination Service. Portlock weighed 319 pounds and her blood pressure was 140/90. Dr. Decarli noted that Portlock had some swelling of her shoulder, knee and most joints in her hands. Portlock also had difficulty walking heel to toe because of shortness of breath. As a result, Dr. Decarli diagnosed Portlock with asthma respiratory insufficiency and generalized muscle aches, probably due to bursitis. Decarli further noted that Portlock appeared to be depressed, but had no difficulty answering questions. Dr. Decarli diagnosed her with anxiety/depression with a component of major depression.

On November 21, 1995, a psychologist reviewed Portlock's records and completed a mental residual functional capacity assessment. He assessed that Portlock was moderately limited in the ability to carry out detailed instructions, to maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. The psychologist did not find that Portlock was markedly limited in any category. He also documented that Portlock suffered from major depression. Nonetheless, the psychologist suggested that Portlock attend a support group and that she was capable of "routine, repetitive work."

On May 15, 1996, a medical consultant reviewed Portlock's records for the state agency and completed a physical residual functional capacity assessment. He concluded that Portlock could lift twenty pounds occasionally and ten pounds frequently and that she could both stand and/or walk and sit for about six hours per workday. Furthermore, he concluded that she could occasionally climb, balance, lift, stoop, kneel, crouch and crawl.

Portlock began visiting Total Care Physicians in December 1996. On her initial visit, Portlock weighed 331.75 pounds and her blood pressure was 138/86. On February 26, 1997, Dr. Goodman of Total Care, began to see Portlock. On August 4, 1997, Portlock complained that she was unable to exercise for longer than five minutes because of joint disease in her knees and the excess weight that she gained due to depression. On August 27, 1997, Portlock complained about knee pain. As a result, Dr. Goodman ordered x-rays. However, Dr. Goodman did not make any significant findings.

### 2. *Portlock's Treating Physicians*

In March 1996, Portlock began to see Dr. Calvin Robinson for her depression. In her initial visit on March 18, 1996, Portlock reported that she was depressed over the death of her fiancé and that she had attempted suicide three years prior to the visit. Dr. Robinson concluded that Portlock suffered from major depression and prescribed Prozac. On April 8, 1996, Portlock reported that she still suffered from crying spells, but that the Prozac was helping. On April 29, 1996, Portlock reported that her mood had worsened because she had experienced a flashback of her fiancé on a ventilator. As a result, Dr. Robinson increased her dosage of Prozac.

On June 13, 1996, Dr. Robinson completed a medical certification for the Delaware Division of Social Services. Dr. Robinson reported that Portlock suffered from depression, anxiety, hypertension, asthma, and bursitis. Dr. Robinson opined that Portlock's ability to work or participate in training would be substantially reduced for 6–12 months. On October 21, 1996, Lynn Goddess, Portlock's treating therapist who worked in conjunction with Dr. Robinson, noted that Portlock appeared "resigned" due to a number of "environmental problems." Nevertheless, on that same day,

Portlock stated to Dr. Robinson that she was feeling more hopeful and would begin to apply for jobs.

On January 2, 1997, Goddess noted that Portlock was not allowed to start vocational training because of a psychiatric evaluation completed by Dr. Robinson, which concluded that she was incapable of participating in any training activities at that point in time. Portlock asserts that this psychiatric evaluation was completed in late 1996. Nevertheless, Dr. Robinson's psychiatric evaluation does not appear to be in the record.

At the next session on February 3, 1997, Portlock related to Goddess that she was very depressed and was sleeping a great deal. On February, 24, 1997, Dr. Robinson noted that Portlock felt tired and unfocused. Portlock also stated that she suffered from "increased paranoia." Portlock did not visit Dr. Robinson or Goddess again until July 5, 1997, at which time she told Dr. Robinson that she was suffering from migraine headaches.

Portlock next visited Dr. Robinson on March 4, 1998, after spending six months in Florida with her brother. Portlock told Dr. Robinson that she was involved in an abusive relationship that led her to attempt suicide through an overdose of Valium in February 1998. Portlock then saw Goddess on March 9, 1998 and March 18, 1998, at which times Portlock discussed her abusive relationship in Florida and her emotionally abusive relationship with her father.

Goddess completed a mental residual functional capacity assessment on March 30, 1998, which Dr. Robinson co-signed. In the assessment, Goddess and Dr. Robinson stated that Portlock was markedly limited in all functional areas categorized under the headings "Understanding and Memory" and "Sustained Concentration

and Persistence." Goddess also noted that the she needed to work with Portlock over a longer period of time in order to assess Portlock's response to change. Despite the assessment, the record contains notes reflecting Portlock's improved mental state in April 1998.

### 3. *Testimony at the Hearing*

On April 20, 1998, Judge Reddy conducted a hearing to determine whether Portlock was disabled within the meaning of the Act. Attorney Janet Huffman represented Portlock. Portlock and the Vocational Expert, William T. Slaven, were the only persons to testify at the hearing.

### a. *Portlock's Testimony*

Portlock testified that she was living with her father at his house. Portlock said that she possessed a driver's license and drove two to three times a week, but she stopped working full-time in March 1995, due to her impairments. Portlock testified that she looked for work, but that Dr. Robinson removed her from vocational rehabilitation, due to her mental impairments.

Portlock also testified that she suffered from asthma, high blood pressure, depression and bursitis. Portlock said that the asthma causes her to experience shortness of breath and/or hyperventilate and, as a result, she uses an inhaler twice every four hours. Portlock also stated she uses an inhaler more frequently if the weather is hot or damp.

Portlock testified that the bursitis, which affects her right shoulder and left knee, is so severe that she cannot lift anything above the level of her shoulders. Portlock further testified that the bursitis causes her knee to give out sometimes and she cannot sit or stand for long periods of time. As a result, Portlock is taking the medication Rufflan. Portlock also testified that the bursitis bothers her everyday and some days she cannot get out of bed at all.

Portlock testified that her depression causes her to have crying spells, fixed stares and to sleep a lot. Moreover, she said that her depression forces her to stay in bed all day two or three times a week. As a result, Portlock is currently taking Prozac, Trazadone and Valium.

Portlock also testified that she took a whole bottle of Valium and Trazadone in attempt to kill herself, two months previous to the hearing. After ingesting the Valium and Trazadone, Portlock slept for three days before her father found her and summoned medical assistance. Portlock further testified that depression causes her to experience concentration problems and to be generally paranoid. Her paranoia causes her to "see things" when she drives or become suspicious that people are talking about her when she is in a large group.

In assessing her physical capabilities, Portlock testified that she could lift ten to twenty pounds and walk one block at a slow pace. Portlock further testified that she could stand for ten to fifteen minutes before her knees feel numb. She also stated that she could sit for fifteen minutes to one hour, depending on the weather, and that she could kneel, crouch, and stoop "very slowly." Portlock further testified that she is still able to drive and, at times, walk up and down stairs.

### b. *Vocational Expert's Testimony*

Judge Reddy submitted four hypothetical claimants to Vocational Expert, Michael Slaven so that Slaven could assess each of their employment capabilities. The first hypothetical claimant was a person who could lift ten pounds frequently, twenty pounds occasionally, walk or stand six hours per eight hour workday or sit six hours per eight hour workday. The first hypothetical claimant also was 32 to 35 years old, with two and a half years of

college and could never climb ladders, ropes or scaffolds.

Furthermore, the first claimant could only occasionally climb stairs, balance, bend, stoop, kneel, crouch, squat, and crawl. The first claimant should also avoid all exposure to unprotected heights and avoid moderate exposure to fumes, odors, dust, gasses and poor ventilation. In addition, the claimant would have a moderate limitation in their ability to carry out detailed instructions and a moderate limitation in their ability to maintain attention and concentration for extended periods. The claimant would also have a moderate limitation in their ability to complete a normal workday and/or work week without interruptions from psychologically based symptoms or perform at a consistent pace without an unreasonable number of rest periods.

Based on the characteristics of the first claimant, Slaven testified that he or she could not work as a food service worker, psychiatric attendant, child care worker and nursing assistant. Nevertheless, Slaven opined that such a person could work as a mail clerk, office helper, information clerk, or a charge account clerk.

Judge Reddy then submitted a second hypothetical claimant who had all of the same limitations as the first, but also could not lift anything over his or her head. Slaven opined that such a person could still be an office helper, information clerk or a charge account clerk, but not a mail clerk. Judge Reddy then submitted a third hypothetical claimant who had all of the same limitations as the first two, but could only perform sedentary work rather than light work. Slaven testified that the third claimant could also be an office helper, information clerk, or a charge account clerk.

Judge Reddy then submitted a fourth hypothetical claimant that would have all

the limitations that Portlock testified about, if Portlock's testimony was found to be fully credible and well supported. Slaven testified that the fourth claimant could not be employed at all. Slaven opined that someone who sleeps all day two or three times a week could not maintain full-time employment. Moreover, the physical limitations that Portlock testified about would restrict Portlock's range of motion to such a degree to eliminate some of the previously mentioned occupations. Finally, Slaven testified that Portlock's crying spells and isolation would also eliminate full-time employment.

### D. *Judge Reddy's Decision*

■ Judge Reddy ultimately concluded that Portlock was not disabled under the Social Security Act. He found that Portlock suffered from "severe" impairments that prevented her from returning to any of her past occupations, but that she could maintain jobs that existed in the national economy. In order to establish a disability under the Social Security Act, Portlock must demonstrate some "medically determinable basis for an impairment that prevents her from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Plummer v. Apfel,* 186 F.3d 422, 427 (3d Cir.1999).

An Administrative Law Judge determines whether a claimant is disabled through a sequential five-step inquiry pursuant to 20 C.F.R. § 404.1520. The Judge first determines whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he or she will be found not disabled regardless of the medical findings. Judge Reddy accepted Portlock's assertion that she had not worked since November 1994. Therefore, Judge Reddy found that Portlock was not

currently engaged in substantial gainful activity.

Second, an Administrative Law Judge will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. Judge Reddy found that Portlock's asthma, bursitis, obesity, high blood pressure, and depression could place substantial limitation upon Portlock's basic work activities. *See* 20 C.F.R. § 404.1521; 20 C.F.R. § 416.921. Therefore, Judge Reddy concluded that Portlock suffered from a severe impairment.

Third, if an Administrative Law Judge determines that a claimant suffers from a severe impairment, the Judge will then determine whether the impairment meets or equals a listed impairment in Appendix I of sub-part P of Regulation No. 4 of the Code of Regulations. If so, that individual will be considered "disabled" under the Act. At this step, the burden is on the claimant to present medical findings that demonstrate that his or her impairment matches a listing or is equal in severity to a listed impairment. *See Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir.1992). If the individual meets or equals any listed impairments, the claimant will be found disabled. Judge Reddy concluded that none of Portlock's impairments met or equaled the Listings of Impairments in Appendix 1, Subpart P, Regulation No. 4. Judge Reddy specifically rejected Portlock's obesity because (1) the required blood pressure readings were not consistently met and (2) the results of Portlock's pulmonary tests were unreliable.

If the claimant does not meet a listing, the Administrative Law Judge must determine if the individual is capable of performing his or her past relevant work considering his or her severe impairment. At this step, the claimant bears the burden of demonstrating an inability to return to her past relevant work. *See Adorno v. Shala-*

*la*, 40 F.3d 43, 46 (3d Cir.1994). A finding of the claimant's ability or inability to return to work is based upon the medical evidence of the record, the claimant's testimony and credibility. In assessing Portlock's mental impairments, Judge Reddy concluded that Portlock's treating physician's reports could not be accorded controlling weight because they were not well-supported by medically acceptable clinical and/or laboratory diagnostic techniques. Judge Reddy also concluded that Portlock's subjective complaints were not supported by the objective medical evidence. Nevertheless, Judge Reddy accepted Vocational Expert Slaven's testimony that Portlock could only perform light work and, as a result, could not return to her past work as a child care worker, a nursing assistant, a food service worker or a psychiatric aide.

If the claimant is unable to resume her former occupation, the evaluation moves to the fifth and final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate that the claimant is capable of performing other available work in the national economy in order to deny a claim of disability. *See Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir.1999). The Administrative Law Judge must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. Judge Reddy concluded that Portlock was capable of performing work at a limited range of light work. Positions in this category included office helper, information clerk and charge account clerk. As a result, Judge Reddy found that Portlock was not disabled within the meaning of the Act and denied her claim for benefits.

## II. *DISCUSSION*

### A. *Standard of Review*

 A court may not disturb the Administrative Law Judge's decision if it is

grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence has been defined as "more than a mere scintilla" and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Plummer,* 186 F.3d at 427. To demonstrate that his opinion is based on substantial evidence, the Administrative Law Judge must make specific findings of fact to support his or her ultimate findings. *See Stewart v. Secretary of HEW,* 714 F.2d 287, 290 (3d Cir.1983).

### B. *Portlock's Contentions of Error*

Portlock asserts that Judge Reddy's findings were not supported by substantial evidence. First, Portlock contends that Judge Reddy failed to properly evaluate the medical opinions of Portlock's treating physicians. Second, Portlock contends that Judge Reddy failed to properly evaluate Portlock's residual functional capacity. Third, Portlock contends that due to her impairments, she qualifies as disabled under Listing 9.09A for Obesity. Finally, Portlock contends that Judge Reddy failed to adequately explain his findings in the Psychiatric Review Technique Form.

### 1. *Did Judge Reddy Fail to Properly Evaluate the Medical Opinions of Portlock's Treating Physicians?*

Portlock contends that Administrative Law Judge Reddy failed to properly evaluate the medical opinions of her treating physician because (1) Judge Reddy erroneously rejected a residual functional capacity assessment completed by Goddess and co-signed by Dr. Robinson that concluded Portlock was "markedly limited" in her mental capacity; (2) Judge Reddy rejected the residual functional capacity assessment without pointing to contrary medical evidence; (3) Judge Reddy did not consider a report completed by Dr. Robinson in "late 1996" that stopped Portlock from participating in vocational rehabilitation; (4) Judge Reddy misidentified exhibit 31, and as a result, did not consider all evidence submitted by Portlock's treating physician.

### a. *Did Judge Reddy Erroneously Reject the Residual Functional Capacity Assessment Completed by Goddess and Co-signed by Dr. Robinson?*

■■ Judge Reddy concluded that he could not give Dr. Robinson's opinions contained in the residual functional capacity assessment "controlling weight" because "the record contain[ed] no documentation to support the findings of severity of [Portlock's] depression," and that Dr. Robinson's opinions were not well-supported by medically acceptable clinical and/or laboratory diagnostic techniques. A principle guiding disability determinations is that the Administrative Law Judge accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir.1999) (quoting *Rocco v. Heckler,* 826 F.2d 1348, 1350 (3d Cir.1987)).

Dr. Robinson and Goddess treated Portlock from March 1996 to March 1998. The treatment was documented through office notes that can best be described as inconsistent. At times, the notes state that Portlock's affect was blunt and her mood down, while at other times they state that her affect was bright and her mood was good. Furthermore, the record does not contain a formal psychiatric evaluation by Dr. Robinson. Portlock asserts that Dr. Robinson completed a psychiatric evaluation in "late 1996," but admits in her reply brief that an evaluation is not in the record. Thus, it appears that Judge Reddy properly exercised his discretion in reject-

ing the opinions contained in Dr. Robinson's and Goddess's residual functional capacity assessment for lack of medically acceptable support.

b. *Did Judge Reddy Reject the Residual Functional Capacity Assessment Without Discussing Contrary Medical Evidence?*

■ Portlock next contends that Judge Reddy improperly rejected Dr. Robinson's opinion without pointing to contrary medical evidence. An Administrative Law Judge is not required to discuss contrary evidence if he or she finds that the treating physician's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques. *See* 20 C.F.R. § 404.1527(d)(2). Alternatively, even if Judge Reddy were required to discuss contrary medical evidence, he did so by reviewing Dr. Bolton's psychiatric evaluation completed on November 3, 1995. The evaluation concluded that Portlock's Global Assessment of Functioning ("GAF") was 65–70. Judge Reddy stated that this "represents some mild symptoms, but generally functioning well." As a result, Judge Reddy discussed the only formal psychiatric evaluation that appeared in the record and it opined that Portlock is not severely impacted by her depression.

c. *Did Judge Reddy Erroneously Fail to Consider a Report Completed by Portlock's Treating Physician in "Late 1996"?*

Portlock next contends that her treating physician's opinion was not properly considered because Judge Reddy ignored Dr. Robinson's psychiatric evaluation completed in "late 1996." According to the office notes, Dr. Robinson completed a psychiatric evaluation in "late 1996" that stopped Portlock from starting vocational rehabilitation in early 1997. The evaluation in question is not in the record. Nevertheless, Portlock contends that the existence of the evaluation in the record is not necessary because the office notes elude to its existence. Although a psychiatric evaluation may exist, its conclusions, not its existence, have the most bearing on the severity of Portlock's mental impairments. Thus, Judge Reddy correctly did not consider the "late 1996" psychiatric evaluation.

d. *Did Judge Reddy Misidentify Exhibit 31, and as a Result, Fail to Consider All Evidence Submitted by Portlock's Treating Physician?*

Judge Reddy stated that exhibit 31 contains "progress notes" prepared by Lynn Goddess, a licensed therapist. Portlock asserts that exhibit 31 actually contains notes transcribed by both Dr. Robinson and Goddess. As a result, Portlock contends that Judge Reddy's conclusion that the residual functional capacity assessment was not well-supported is incorrect because Dr. Robinson's notes contained in exhibit 31 were not fully considered.

Although it is not entirely clear from the trial transcript that Judge Reddy did indeed conclude that only Goddess completed the office notes, their author appears not to matter. Judge Reddy was aware that Goddess worked in conjunction with Dr. Robinson and that Dr. Robinson was seeing Portlock on a regular basis. Thus, it is likely that Judge Reddy did attribute the progress notes to Goddess and Robinson when he evaluated their residual functional capacity assessment. Moreover, the progress notes themselves can accurately be described as inconsistent and do not appear to support a finding that Portlock was markedly limited in her mental faculties due to depression. Therefore, it does not appear to matter whether Judge Reddy attributed the progress notes to Goddess only or to both Goddess and Robinson. In sum, any mis-

identification of exhibit 31 did not prejudice Portlock.

### 2. Did Judge Reddy Fail to Properly Evaluate Portlock's Residual Functional Capacity?

■ Portlock next contends that Judge Reddy erroneously concluded at step five that Portlock could perform a limited range of light work. At step five, the burden of production shifts to the Commissioner, who must demonstrate that the claimant is capable of performing other available work in the national economy in order to deny a claim of disability. *See* 20 C.F.R. § 404.1520(f). The function of this court is to determine whether the Administrative Law Judge's opinion was based on substantial evidence, not necessarily the validity of the opinion itself. *See, e.g., Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir.1999).

Portlock asserts that Judge Reddy failed to fully consider Portlock's bursitis in her knees and obesity detailed in her physical examinations and the mental limitations, especially concentration problems, described by her treating physician, Dr. Robinson. In reaching his conclusion that Portlock was capable of a limited range of light work, Judge Reddy relied on (1) medical consultant's report completed on May 15, 1996 that concluded Portlock was capable of a full exertional range of light work and (2) the testimony of the Vocational Expert, Slaven, who, based on four thorough hypothetical claimants, concluded that someone with Portlock's limitations could work as an office helper, information clerk, or a charge account clerk.

Furthermore, Judge Reddy reviewed Portlock's testimony and determined that it was not credible to the degree alleged. Although, Portlock testified that her physical impairments keep her from getting out of bed "quite a few" days a month and that her physical limitations keep her from lifting over the level of her left shoulder, there was no medical documentation in the record that supported Portlock. Finally, Judge Reddy, as explained previously, properly rejected Dr. Robinson's and Goddess' residual functional capacity assessment due to a lack of medically acceptable support.

Thus, a review of the record demonstrates that Judge Reddy evaluated Portlock's testimony, a vocational expert's testimony, a medical consultant's report and evaluated and ultimately rejected Portlock's physicians' evidence in determining that Portlock was capable of a limited range of light work at step five. Therefore, it appears that Judge Reddy's decision regarding Portlock's physical limitations at step five was based on substantial evidence.

### 3. Did Portlock's Impairments Meet Listing 9.09A for Obesity?

■ Portlock contends that her impairments meet Listing 9.09A for obesity. If a claimant meets or equals a listed impairment, she is conclusively presumed to be disabled. *See* 20 C.F.R. §§ 404.1520(d); 416.920(d). In determining whether a claimant's impairment(s) equate a Listing, the Administrative Law Judge must follow 20 C.F.R. § 404.1526(a),[1] which requires

---

1. (a) How medical equivalence is determined. We will decide that your impairment(s) is medically equivalent to a listed impairment in appendix 1 if the medical findings are at least equal in severity and duration to the listed findings. We will compare the symptoms, signs, and laboratory findings about your impairment(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment. If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal. If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the

the Administrative Law Judge to compare the claimant's signs, symptoms, and laboratory findings to all of the possible Listings. In discussing whether Portlock met 9.09, Judge Reddy discussed only 9.09B and concluded that Portlock did not meet 9.09B because "the required blood pressure readings [were] not ... persistently met, and results of pulmonary function tests [were] not ... reliable." Portlock contends, however, that Judge Reddy should have also discussed why Portlock did not meet 9.09A and therefore, Judge Reddy, committed reversible error.

Nevertheless, before it can be determined whether Judge Reddy should have discussed the applicability of 9.09A to Portlock, it must be determined whether Listing 9.09 presently applies to Portlock at all. On October 29, 1999, while Portlock's claim was on appeal in this court, Listing 9.09 was deleted. The Social Security Administration through a document entitled the Revised Medical Criteria for Determination of Disability, stated that Listing 9.09 was removed because "the criteria ... were not appropriate indicators of listing-level severity [in that] they did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity." 64 Fed.Reg. 46122, 46122 (1999). Obesity has not been removed as a consideration for disability, however, because new language regarding obesity was inserted into other listings for the affected body systems. The Revised Medical Criteria states, "new paragraphs we have added to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings in the final rules provide guidance for our adjudicators in the proper handling of claims involving obesity." *Id.* at 46127.

The Commissioner contends that Portlock's claims should be evaluated in accordance with the revised rules because these rules apply to claims filed before the effective date of the act that are awaiting initial determination or pending appeal at any administrative level or to the court. Moreover, at least two district court opinions have ruled that the revised "guidance," not the deleted Listing 9.09, should apply to claims still awaiting final determination in federal district court. *See Fulbright v. Apfel,* 114 F.Supp.2d 465, 476 (W.D.N.C. 2000) (finding that the removal of 9.09 and subsequent revision to the other listings applied to a pending claim filed before October 25, 1999); *Wooten v. Apfel,* 108 F.Supp.2d 921, 924 (E.D.Tenn.2000) (stating that the new rules have prospective effect and, therefore, apply to cases pending at the time the rules took effect in October, 1999). In describing the effect of the change, the Revised Medical Criteria states only that the deletion of Listing 9.09 is to have "prospective effect," so that individuals previously found disabled under Listing 9.09 will not be re-evaluated under the revised criteria. *See id.* at 42127. Furthermore, the District Court in *Fulbright* refers to SSR 00–3p, "Titles II and SVI: Evaluation and Obesity," 65 Fed. Reg. 31, 039 (2000), which states that "[t]he final rules deleting listing 9.09 apply to claims that were filed before October 25, 1999, and that were awaiting an initial determination or that were pending appeal at any level of the administrative review process or that had been appealed to the court." *See Fulbright,* 114 F.Supp.2d at 476.

Conversely, Portlock asserts that the deleted 9.09 should apply to her claim because it was a "regulatory change" and that "there was no express grant for retro-

symptoms, signs, and laboratory findings about your impairments to determine whether

the combination of your impairments is medically equal to any listed impairment.

activity to be applied." In support, Portlock cites *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), for the proposition that the law disfavors retroactivity. *See id.* at 208, 109 S.Ct. 468. In *Bowen,* the Supreme Court found that the Secretary of Health and Human Services could not retroactively reinstate a cost-limit rule that, if applied, would have allowed the Secretary to recoup overpaid sums from participating institutions of Medicare. *See id.* at 215, 109 S.Ct. 468. Although the Secretary had the authority to promulgate cost-limit rules, the Court found that "administrative rules [are not] construed to have retroactive effect unless their language requires this result." *Id.* at 208, 109 S.Ct. 468. Moreover, an unpublished Tenth Circuit opinion and District of Kansas opinion have cited *Bowen* and ruled that the deleted 9.09 should be applied in claims filed before October 25, 1999. *See Nash v. Apfel,* 2000 WL 710491, 2000 U.S.App. LEXIS 12030, No. 99–7109 (10th Cir. June 1, 2000); *Rudolph v. Apfel,* 2000 WL 1916317, at * 7, 2000 U.S.Dist. LEXIS 19191, at *18 (D.Kan. December 29, 2000) (stating that "the Commissioner has failed to demonstrate that the agency had a specific intent to apply the 1999 deletion retroactively").

Due to the lack of agreement on this issue, this court requires further direction whether Listing 9.09 or the revised listings apply to Portlock's claim. Therefore, the court will remand this case to the Administrative Law Judge to determine which criteria applies and whether Portlock meets its requirements.

4. *Did Judge Reddy Fail to Adequately Explain His Findings in the Psychiatric Review Technique Form?*

Portlock finally contends that Judge Reddy failed to adequately explain his findings the Psychiatric Review Technique Form ("PRTF"). The agency must complete a "standard document," see 20 C.F.R. § 404.1520a(d), called a "Psychiatric Review Technique Form," which is essentially a checklist that tracks the requirements of the Listings of Mental Disorders. *Id.* at Pt. 404, Subpt. P, App. 1, § 12 (1987). The regulations permit an Administrative Law Judge to complete the form without the assistance of a medical adviser. *Id.* at § 404.1520a(d)(1)(i). However, there must be competent evidence in the record to support the conclusions recorded on the form and the Administrative Law Judge must discuss in his opinion the evidence that he considered in reaching the conclusions expressed on the form. *See id.* § 404.1520a(c)(4); *Plummer v. Apfel,* 186 F.3d 422, 433 (3d Cir.1999) (stating that in completing PRTF, "ALJ has a duty to consider all evidence of impairments in the record").

Judge Reddy fully considered and explained Portlock's medical evidence regarding her depression and other mental impairments. Specifically, Portlock's treating physician's opinion was rejected because it was not well-supported by medically acceptable clinical and/or laboratory diagnostic techniques. Judge Reddy also pointed to Bolton's psychiatric evaluation to affirmatively demonstrate that Portlock was not severely mentally limited. Therefore, it appears that the PRTF was adequately supported by the record.

## III. CONCLUSION

The court has considered Portlock's arguments that the Administrative Law Judge erred in refusing her disability insurance benefits and supplemental security income. In conclusion, the court finds that there is substantial evidence to support: (1) the Administrative Law Judge's decision to reject Portlock's treating physi-

cian's opinion; (2) the Administrative Law Judge's evaluation of Portlock's residual functional capacity; and (3) to support the findings contained in the Psychiatric Review Technique Form. Thus, the court will grant the Commissioner's motion for Summary Judgment as to these three issues.

With regard to the effect of deleted Listing 9.09, this court remands this case to the Administrative Law Judge to determine whether the listing should apply to Portlock and, if it does, whether she meets its requirements.

The court will enter an order consistent with this opinion.

### ORDER GRANTING SUMMARY JUDGMENT IN PART AND REMANDING IN PART

For the reasons stated in the opinion of this date, IT IS HEREBY ORDERED:

1. Portlock's motion for summary judgment (D.I.9) is denied.

2. Apfel's motion for summary judgment (D.I.11) is granted in part.

3. This case is remanded to the Administrative Law Judge for proceedings consistent with this opinion.