**Charles BUSH, Plaintiff,**

v.

**Jo Anne BARNHART, Defendant.**

**No. Civ.A. 02–339 GMS.**

United States District Court,
D. Delaware.

Aug. 28, 2003.

Gary L. Smith, Attorney at Law, Newark, DE, for Plaintiff.

Paulette K. Nash, U.S. Attorney's Office, Wilmington, DE, for defendant.

### MEMORANDUM AND ORDER

SLEET, District Judge.

## I. INTRODUCTION

On December 13, 1999, the plaintiff, Charles Bush ("Bush") applied for disabili-ty insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and XVI, respectively, of the Social Security Act (the "Act"). In his application, Bush alleged that he had been disabled since October 26, 1989 due to stiffness from gout, back pain, arthritis, and asthma. His application was denied on May 4, 2000, and again upon reconsideration on June 6, 2000. Bush then timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). The ALJ held the requested hearing on January 26, 2001, and by a decision dated February 21, 2001, found that Bush was capable of making a vocational adjustment to other available work. Bush subsequently filed a request for review by the Appeals Council. On March 22, 2002, the Appeals Council denied his request as it found no basis to review the ALJ's decision.

Having exhausted his administrative remedies, Bush filed the above-captioned complaint on May 3, 2002. Bush moved for summary judgment on June 30, 2003, and the Commissioner of Social Security ("the Commissioner") filed a cross-motion for summary judgment on August 8, 2003. Because the court finds that the ALJ's decision is supported by substantial evidence, the court will deny Bush's motion, grant the Commissioner's motion, and enter judgment accordingly.

## II. BACKGROUND

### A. Medical Evidence [1]

According to a detailed report by Dr. Pierre L. LeRoy ("Dr.LeRoy"), a neurologist who treated Bush in 1993, Bush was working at ARA Vending Services when

---

**1.** In order for Bush to be eligible for DIB, it is his burden to prove that he became disabled on or before December 31, 1994, the date that his insured status expired. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. §§ 404.131(a), 404.315(a)(1) (2002).

he allegedly injured his back on October 23, 1989. Following the work-related injury in October 1989, Bush went to the emergency room where doctors took lumbar x-rays. These x-rays indicated no abnormalities. Bush's family physician, Dr. Ralph E. Burdick ("Dr.Burdick"), then determined that conservative treatment was in order. Although the record contains treatment notes from Dr. Burdick for a few visits from 1993 to 1996, there is no record of treatment in 1989, and no report of the work-related injury.

In December 1989, Dr. Sternberg diagnosed low back pain with lumbosacral strain and sprain. He placed Bush on one month of temporary total disability and recommended a course of physical therapy and home exercise.

In January 1990, Dr. Sternberg reported that Bush's back strain was "for the most part resolved," and he released Bush to perform any type of employment with no restrictions. In fact, however, Bush did not return to work, and there is no record of any treatment until eight months later. At that time, Dr. LeRoy performed an initial neurological evaluation for persisting symptoms of low back pain. To counteract the pain, Bush was taking Valium, Tylenol 3 and occasionally Flexeril. He also admitted to occasionally drinking to relieve the pain.

Bush told Dr. LeRoy that he attempted to return to work, but after one day, he was terminated for not having a Social Security card. He stated that he then attempted to work at other jobs, but because they all required extensive bending and stooping, he was unable to continue due to his pain symptoms. Dr. LeRoy recommended Flexeril, Tagamet, and home exercises. He also cautioned Bush against drinking excess alcohol for pain relief.

On September 13, 1990, Bush underwent a lumbar CT scan which revealed neither disc herniations nor bulging at L3–4 or L4–5. Instead, the scan showed a moderate-sized left lateralized disc herniation at L5–S1. Bush also underwent medical thermography studies of the lumbar area and lower extremities which were reportedly within normal limits.

In late 1990, Bush began vocational rehabilitation to obtain a suitable light-duty job. Dr. Fink performed an independent medical evaluation on November 20, 1990 and recommended an additional two to three months of physical therapy. Pending no exacerbations of Bush's symptoms, Dr. Fink then recommended a return to a light-duty position. Following two months of physical therapy, however, Bush reported that his symptoms were gradually returning and that the therapy was unhelpful. He was not taking any medication for his pain at that time. He thus remained on temporary total disability pending placement by vocational rehabilitation in a suitable light-duty job.

In June 1991, Bush completed his vocational rehabilitation testing and was waiting for approval of his Work Tolerance and Cybex evaluations. He reported partially effective relief from some over-the-counter medications, and was again advised against using alcohol for relief.

In July 1991, Bush's Work Tolerance Evaluation indicated that he demonstrated the capability to remain active for an eight-hour day as long as he was allowed to alternate sitting, standing, and walking. Furthermore, the evaluation indicated that he was capable of safely lifting twenty-five pounds from a squat, and up to thirty pounds from knuckle to chest. He was recommended for work hardening and weight loss programs.

In October 1991, Bush was advised to discontinue his medications, and instead,

take 600 milligrams of Ibuprofen and Amitriptyline for stress, pain, and sleep. He remained on temporary total disability and was encouraged to continue with work hardening and vocational rehabilitation until December 20, 1991. At that time, he would be ready for full-time light-duty work. However, after complaining of continuing symptoms with little relief from treatment, Bush's program was extended an additional twelve weeks.

In March 1992, Bush told Dr. LeRoy that his symptoms were exacerbated because he was more active. He stated that he had nevertheless learned to manage his physical boundaries and realized that, although he could not return to his past work, he was in the process of starting a new business with friends. Dr. LeRoy ended his report by indicating that Bush had a 15% permanent partial low back impairment and a 10% permanent partial left lower extremity impairment. In Dr. LeRoy's medical opinion, Bush was capable of working in a light-duty capacity, with flexibility to alternate standing, sitting, and walking, with infrequent bending, stooping, and with no more than occasional lifting of twenty pounds or less.

In 1993, Bush again saw Dr. LeRoy for complaints of various arthralgias and tendinitis of the left wrist. Bush reported that his intermittent low back pain had improved since not returning to work and that he was taking Relafen. He further reported that his general health was good, but that he was no longer at his job as a self-employed custom painter due to the stooping and bending aspects of that work. On July 9, 1993, Dr. LeRoy diagnosed that Bush's left lumbosacral strain with sciatica was stable. However, due to his left herniated disk at L4–5–S1, Bush was released to work with light duty restrictions. Dr. LeRoy assessed Bush's motivation at level 5.

In September 1993, Bush saw an orthopedist, Dr. Stephen L. Hershey ("Dr.Hershey"). Dr. Hershey recommended that Bush be seen by a rheumatologist due to his twenty-year history of polyarthritis. Dr. Hershey also opined that Bush's complaints of leg and foot pain did not appear to be gout from an x-ray point of view. He concluded that Bush's symptoms defied an orthopedic diagnosis.

One week later, Bush saw Dr. Peter V. Rocca ("Dr.Rocca"), a rheumatologist. Dr. Rocca noted that Bush had a twenty-five-year history of musculoskeletal pain, was drinking to excess on occasion, and was using marijuana recreationally. Based upon an analysis of fluid taken from Bush's right ankle, Dr. Rocca diagnosed episodic inflammatory arthritis involving the lower extremities with crystalline-proven gouty arthritis. Dr. Rocca opined that intercritical therapy was not necessary, but warned Bush that alcohol, as well as certain foods, could trigger the gout process. Although there was no follow-up treatment, Dr. Rocca submitted a letter in February 2000 stating that Bush was treated in May and October 1994 for left knee and ankle problems.

Bush saw Dr. Burdick four times between 1993 and 1994 for prescription medication. Chest x-rays and left wrist x-rays taken during that time period were both normal.

The record reveals that Bush had no treatment for his complaints of back pain and asthma after December 31, 1994. He saw Dr. Burdick four times between 1995 and 1996 for upper respiratory infections and gout. Additionally, both a chest x-ray and Bush's rheumatoid factor were negative.

The only record of treatment from 1997 to 2000 is a report submitted by Dr. Rocca. This report states that he saw Bush once

in 1997 for left knee and ankle problems and once in 1999 for gout and synovitis of the left ankle and mid-foot. The only note of treatment for 2000 is Dr. Burdick's treatment of Bush for flu symptoms.

On April 18, 2000, Dr. Yong K. Kim ("Dr. Kim") performed a consultative examination at the request of the state agency. Bush told Dr. Kim that, since the age of twenty, he has experienced frequent episodes of gout in his feet, knees, and left wrist. Even though there is no record of such treatments since July 1993, Bush also stated that he has had low back pain since 1990 which he would rate as three to seven on a scale of ten. He also stated that he has asthma attacks once a week, and that he smokes one-half of a pack of cigarettes a day.

Dr. Kim's physical examination of Bush was unremarkable. Specifically, he found the following: (1) Bush's lungs were clear; (2) his upper and lower extremities functioned within normal limits and were without swelling, tenderness, or temperature elevation; (3) his cervical spine was within normal limits with only mild tenderness noted in the left lumbar and sacroiliac areas; and (4) his sensory functioning, deep tendon reflexes, muscle strength, and gait were all within normal functioning limits.

### B. Hearing Testimony

During the administrative hearing, Bush testified that he attempted to return to work in 1999, ten years after his alleged onset date. He attempted jobs such as fork-truck operator, delivery man, and bus cleaner. He stated that he was unable to do the jobs he has tried because of his arthritis attacks, namely attacks of gout, which are the "worst" and "cripple" him for the better half of the year. *See* Tr. at 36–37, 40. He currently lives in his friend's bike shop. The friend gives him

seventy-five dollars per week to sleep at the shop, and in return, he "keeps an eye on things," and helps out during the day when he can. *See id.* at 53–54.

Bush further testified that the pain of a gout attack affects his concentration. As such, he uses a non-prescribed cane approximately half of the year. He does not use a TENS unit or go for chiropractic treatment. Although he stated that surgery was recommended at the time of his work injury, there is no record of any such recommendation. Additionally, although there is no record of steroid injections, he claims that he has received at least a dozen such injections for back pain.

Bush also stated that he sees his rheumatologist every few months, however, there is no evidence of such treatment, aside from a letter dictated by Dr. Rocca dated February 21, 2000. In that dictation, Dr. Rocca noted that, since 1994, Bush had only been treated on three occasions.

Bush further told the ALJ that he has four herniated disks, "some up [his] neck," although the record does not reflect that a doctor has ever diagnosed his neck. Tr. at 52. Rather, he testified that he just "knows." *Id.* Additionally, when the ALJ asked Bush if he smoked, he responded no. However, he later admitted that he does so "on and off." *Id.* at 43, 45. He also responded that he does "not really" drink because it aggravates his gout. *Id.* at 45.

Finally, he stated that he lives alone at the bike shop, drives twice a week, does not have a handicap sticker, and that his adult children help him out with money "here and there." *Id.* at 43, 56–57.

### C. The ALJ's Findings

The ALJ first found that Bush's earnings since his alleged onset date of October 1989 did not reflect substantial gainful ac-

tivity as defined by the regulations. He also determined that Bush's episodic gout/inflammatory arthritis, degenerative disc disease of the lumbosacral spine, and bronchial asthma significantly limited his ability to perform basic work activities. The ALJ thus concluded that these conditions were severe. At step three of his analysis, the ALJ found that Bush did not meet the impairments listed in the appendix of 20 C.F.R. pt. 404, subpt. P, app. 1. Next, he resolved the step four issue in Bush's favor by finding that his residual functional capacity to perform a limited range of sedentary work precludes him from returning to his past relevant work.

Relying on vocational testimony, however, the ALJ then concluded that there were significant numbers of sedentary jobs existing in the national economy that Bush could perform, despite his need to alternate between sitting and standing at no more than one hour intervals with no exposure to heights, heavy or vibrating machinery, no exposure to surfaces which are not level, and no bending, pushing, or pulling requirements. In making this decision, the ALJ asked the vocational expert to assume the following situation:

> younger individual, high school education, work history is described without regard to any testimony. Sedentary is equal to functional capacity, must be able to sit, alternate between sitting and standing not to exceed one-hour intervals. These occupations now involve [ ] heavy, vibrating machinery. Indoor work where there is minimal exposure to environmental irritants or temperature extremes, especially cold. Simple routine, repetitive tasks not requiring sustained concentration and retention but I mean concentration and retention to be readily summoned as necessary to complete the records of task for transaction. And last, no bend, push, pull, working on level surfaces. With those

limitations, what, if any jobs exist at the sedentary?

Tr. at 60. Based on the vocational expert's testimony, the ALJ determined that Bush could perform simple, routine tasks such as cutter/paster, telephone information clerk, and surveillance systems monitor.

In light of these findings, the ALJ determined that Bush was not disabled within the meaning of the Act. The sole issue presented by this appeal is whether the ALJ's hypothetical question to the vocational expert is supported by substantial evidence. Specifically, Bush argues that, in posing the hypothetical to the vocational expert, the ALJ failed to credit his subjective complaints of pain. For the following reasons, the court finds the ALJ's conclusions to be supported by substantial evidence.

## III. STANDARD OF REVIEW

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence does not mean a large or a considerable amount of evidence. *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (citing *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir.1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

Credibility determinations are the province of the ALJ, and should only be disturbed on review if not supported by substantial evidence. *Pysher v. Apfel,* Civ. A. No. 00–1309, 2001 WL 793305, at *2

(E.D.Pa. Jul.11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). To demonstrate that the ALJ's opinion is based on substantial evidence, the ALJ must make specific findings of fact to support his or her ultimate findings. *Portlock v. Apfel*, Civ. A. No. 99–931, 2001 WL 753879, at *7 (D.Del. Jul.3, 2001) (citing *See Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir.1983)). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.1988). In social security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Fed.R.Civ.P. 56(c). *See Woody v. Sec. of the Dep't of Health and Human Serv.*, 859 F.2d 1156, 1159 (3d Cir.1988).

## IV. DISCUSSION

The Act defines "disability" in terms of the effect that a physical or mental impairment has on an individual's ability to function in the workplace. *See Heckler v. Campbell*, 461 U.S. 458, 459–60, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). In order to be eligible for benefits, the claimant must not only show that he has a medically determinable physical or mental impairment, he must also show that it is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy. *See* 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A); *see also Campbell*, 461 U.S. at 460, 103 S.Ct. 1952. Thus, under the Act, and its implementing regulations, the claimant bears the burden of proving that he is "disabled." *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1512 (2002).

The Commissioner uses a sequential five-step process in evaluating claims. Specifically, the Commissioner considers whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and (5) if not, whether a significant number of other jobs exist in the national economy that he or she can perform. *See* 20 C.F.R. § 404.1520 (2002). If the Commissioner finds that a claimant is "disabled" or "not disabled" at any point in the sequential evaluation, review does not need to proceed to the next step. *See id.*

According to the governing regulations, an ALJ may not find a claimant disabled based on subjective symptoms alone. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a) (2002). Indeed, as the ALJ in the present case recognized, an RFC assessment must be based upon a consideration of all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. *See* 20 C.F.R. §§ 404.1529, 416.929 (2002); *see also* Social Security Ruling (SSR) 96–7p. The ALJ also correctly noted that the regulations mandate that he consider any medical opinions from acceptable medical sources which reflect judgments about the nature and severity of the impairments and resulting limitations. *See* 20 C.F.R. §§ 404.1527, 416.927 (2002), SSRs 96–2p, 96–6p.

There are situations in which an individual's alleged or reported symptoms, such as pain, suggest the possibility of a greater restriction of the individual's ability to function than can be demonstrated by objective medical evidence alone. 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3) (2002); SSR 96–7p. In such cases, the ability to perform basic work activities can be derived from consideration of other information in conjunction with the medical evi-

dence. *See* 20 C.F.R. § 416.929(c)(3), (4) (2002) (providing that, in evaluating the intensity and persistence of symptoms including pain, the ALJ must consider a claimant's daily activities; the type, dosage, and effectiveness, of pain medication; the treatment, other than medication, received for relief of other symptoms; and any other measures used to relieve pain or other symptoms).

Finally, the responsibility for deciding a claimant's RFC rests squarely with the ALJ. As such, he or she may properly challenge the credibility of a claimant who asserts eligibility based on subjective evidence. 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), 416.946 (2002); *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir.1999) (stating that the ALJ's duty under § 404.1529(c) to evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work, obviously requires the ALJ to determine the extent to which a claimant is accurately describing pain symptoms).

In the present case, in evaluating the credibility of Bush's testimony alleging pain that is "crippling" for over half of each year, the ALJ complied with the governing regulations by considering the objective diagnostic and clinical findings, as well as Bush's daily activities and medical treatments. *See* Tr. at 17–18. Only then did the ALJ conclude that Bush's allegations of debilitating pain and resultant limitations were not "entirely credible." *Id.* at 17. More specifically, the ALJ noted that the objective medical evidence failed to alter his opinion of Bush's allegations that his impairments were capable of producing severe and debilitating pain as alleged. *See* Tr. at 16–18. As support for this conclusion, the CT scan of the lumbar spine in 1990 showed a moderate left lateralized disc herniation at the L5–S1 level,

although upon evaluation by Bush's neurologist, there were no neuromotor deficits. *See* Tr. at 17. Thermographic studies of the lumbar spine and lower extremities performed in 1990 were also within normal limits. *See id.*

Additionally, although there was some left leg paresthesia in an L5–S1 distribution in 1990, Bush subsequently reported some improvement and described his low back pain as "tolerable." Tr. at 17. By 1993, Bush had indicated that his symptoms were improving with treatment, and his neurologist advised that his condition was stable. Tr. at 18. Upon examination in April 2000, Bush had clear lung sounds without any wheezing or rales, normal range of motion and muscle strength of the upper and lower extremities except of the left wrist, no joint tenderness, swelling or temperature elevation, stable knees and normal gait, normal range of motion of the cervical spine, and only "mild" tenderness along the lumbosacral musculature with "slightly" restricted trunk flexion. *See* Tr. at 18. His straight leg-raising examination was negative. Therefore, the court must conclude that the ALJ was in compliance with the regulations in finding that the objective diagnostic and clinical signs were inconsistent with Bush's claim of disabling pain. *See* Tr. at 17.

The ALJ further followed the regulations in determining that Bush's medical sources consistently opined that Bush was capable of working. In January 1990, Bush was no longer taking medication and was released to return to work by Dr. Sternberg. *See id.* He was placed in vocational rehabilitation for placement in a "light" duty job. *See id.* A work tolerance evaluation in 1991 demonstrated that he had the capacity to remain active for an eight-hour workday when allowed to alternate between sitting, standing, and walking. *See id.* The evaluator also found

that he could lift up to thirty pounds. *See id.* In 1992, Bush was again released to work in a sedentary type light-duty position. *See id.* In 1993, when he was last treated for back pain, Dr. LeRoy concluded that, despite Bush's permanent low back and leg pain, he was capable of working in a light-duty capacity in a job which would allow him sitting and standing flexibility, as well as which required infrequent lifting of twenty pounds or less. *See id.*

In addition, neither Dr. Rocca, nor Dr. Kim, Bush's most recent medical examiners, opined that he had limitations of such severity that he was precluded from performing all work activity. *See* Tr. at 18. Similarly, the ALJ also considered the state agency physician's opinions that Bush was not precluded from all work activity. *See id.; see also* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (2002); *Jones v. Sullivan,* 954 F.2d 125, 129 (3d Cir.1991) (stating that the ALJ may give great weight to the opinion of a non-examining physician, and such opinion may constitute substantial evidence to support the ALJ's decision).

Substantial evidence also supports the ALJ's determination that Bush's treatment history did not bolster his allegations of disabling pain for six months out of the year. *See* Tr. at 17–18. Although Bush alleged that he has been disabled since 1989, the evidence showed no record of any treatment until a year later. Significantly, he was only treated conservatively with medication after his alleged work injury. *See id.* at 17. By 1991, Bush was not taking any medication except for Flexeril. He eventually stated that he got partial relief from over-the-counter medications. *See id.* Dr. Rocca reported only two treatments for leg, ankle, and foot pain since 1997. *See id.* at 18.

In further considering Bush's treatment history, the ALJ noted at the administrative hearing that his condition was never significant enough to warrant surgery, chiropractic treatment, a handicap sticker, a permanent back brace, or traction. *See* Tr. at 43, 45–47; *see also Welch v. Heckler,* 808 F.2d 264, 270 (3d Cir.1986) (stating that the absence of significant treatment is a factor that the Commissioner must consider in determining the severity of an alleged condition). Thus, substantial evidence supports the ALJ's findings that Bush's subjective complaints of pain are not consistent with the submitted medical treatment or objective findings.

Moreover, the ALJ also complied with the regulations in finding that Bush's own admissions of his capabilities and daily activities belie his allegations of total disability. Importantly, Bush stated that he lives alone and is able to attend to his personal needs without assistance. *See* Tr. at 16. Further, his friend lets him guard and sleep at his bike shop. *See id.* Bush also stated that he can walk one-quarter mile, stand for one hour, sit for one hour, and lift twenty pounds. *See id.* at 18. In sum, Bush's regular course of daily activities supports the ALJ's determination that Bush was able to perform at least sedentary work that accommodated his limitation on prolonged position and exposure to certain conditions.

In light of the evidence noted and considered in the ALJ's review of this case, there can be no question that substantial evidence exists that Bush's subjective complaints of pain were not entitled to full credence. As the ALJ appropriately stated, viewing the evidence most favorably towards Bush, and giving him the full benefit of the doubt with regard to his pain symptoms, the totality of the evidence simply does not support a finding that Bush is disabled. *See* Tr. at 19.

## V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The Commissioner's Motion for Summary Judgment (D.I.12) is GRANTED.

2. Bush's Motion for Summary Judgment (D.I.10) is DENIED.

3. Judgment BE AND IS HEREBY entered in favor of the Commissioner.